MAGNUS BERG, HANS CARLSON, *ET AL.*, PLAINTIFFS-RESPONDENTS, v. REACTION MOTORS DIVISION, THIOKOL CHEMICAL CORP., A CORPORATION OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued March 19 and 20, 1962—Decided May 21, 1962.

*Mr. Marshall Crowley* argued the cause for the appellant (*Messrs. Mead, Gleeson, Hansen & Pantages,* attorneys; *Mr. Victor C. Hansen,* of counsel).

*Mr. Howard A. Goldberger* argued the cause for the respondents (*Messrs. Goldberger & Ostrow,* attorneys; *Mr. Irving Ostrow,* of counsel).

*Mr. Roger P. Marquis* of the Department of Justice argued the cause for the United States of America as *amicus curiae* (*Mr. David M. Satz, Jr.,* United States Attorney, attorney).

The opinion of the court was delivered by

JACOBS, J. The plaintiffs obtained a judgment against the defendant in the Law Division for compensatory and punitive damages. The defendant appealed and while its appeal was pending in the Appellate Division we certified it on our own motion.

The defendant had contracts with the United States for the development and production of the rocket engine for the X–15 supersonic airplane. The engine is designed for a maximum thrust of 50,000 pounds and 250,000 horsepower. The developmental stage of the engine required numerous tests and the critical testing period began in the spring of 1958. It took place in a test area in Rockaway Township at test stands E–1 and R–2 which were bedded on large concrete bases. E–1 was approximately 6800 feet and R–2 was approximately 3500 feet from the center of the village of Lake Telemark. When tests were conducted the thrusts caused turbulences in the air, and flames approximately 20 to 25 feet long and 18 inches to 2 feet around were

observable at the test stands. The noises which accompanied the tests were referred to in a brochure issued by the defendant as sometimes thunderous and describable as "the whine of a jet, the smash of a cannon, the roar of a rocket engine."

Shortly after it commenced testing, the defendant began receiving complaints from the plaintiffs who were the owners and occupants of homes at Lake Telemark. Under date of July 10, 1958 the plaintiff Halfdan Thoresen wrote a letter to the defendant and, in response, received a visit from Colonel Richard F. Whitcomb who was in charge of its public relations. Mr. Thoresen testified that he complained to the Colonel that the defendant's testing was disturbing his sleep and causing his home "to come apart" and that the Colonel had said that "the damages, if they were due to their negligence, they would be repaired." The Colonel acknowledged that he had visited Halfdan Thoresen following receipt of the letter. He testified that he explained the nature and significance of the defendant's program and denied that he ever made any absolute commitment to pay for any damages caused by the testing. The Colonel testified that the only other written complaint he received was from the plaintiff August Selland who wrote a letter under date of October 3, 1958. Mr. Selland testified that the Colonel called upon him in response to his letter, that he restated his complaints about the noise and damage to his property, and that the Colonel had then inquired "Why don't you move to a place further away where this noise won't bother you." This was disputed in the Colonel's testimony.

On August 7, 1958 the Colonel, in the company of Mr. Michael who was also a public relations representative of the defendant, attended a meeting of the Lake Telemark residents who were complaining about the effects of the defendant's activities. A film was shown and the residents were told about the high importance of the X–15 and the urgent necessity for the testing. The plaintiff Erling Thoresen testified that the complainants at the meeting were advised that there "would be no relief at this time" from

the noise and that "if anything it would get worse." On August 18, 1958' the members of the Rockaway Township Committee met with representatives of the defendant and as a result the defendant, according to Colonel Whitcomb's testimony, undertook to do the following: (1) to restrict its major test operations to the hours between 7 A. M. and 8 P. M. until further notice; (2) to set up an auxiliary burner control which would burn off excess ammonia fumes; (3) to engage a seismographic consultant; (4) to arrange firing test schedules, insofar as practical, so that the tests would not interfere with the recess periods of the K. D. Malone School; (5) to submit weekly reports of test firings to the Township Committee; (6) to procure the services of a consultant in sound levels and in the possibility of constructing and designing a sound suppressor; and (7) to honor its responsibility for legal claims.

The defendant confined its major test operations to the hours between 7 A. M. and 8 P. M. until April 1959. Colonel Whitcomb testified that at that time, and following a conversation with Mayor Vandermark of Rockaway Township, the testing hours were extended because "we were falling so far behind in our urgent schedule with the Air Force that they insisted that we step up our program." The defendant's undertaking to control the ammonia fumes was admittedly fulfilled. Similarly, it fulfilled its undertaking to engage a seismographic consultant. This consultant took readings in the Lake Telemark area and testified that he picked up no ground vibrations which could do damage to the nearby structures. He acknowledged, however, that he was not an expert in air vibrations or their effects. Colonel Whitcomb testified that the undertaking to avoid testing, so far as practical, during recess periods of the Malone School was fulfilled, although the plaintiffs point to evidence which tends to indicate that testing may have taken place during such periods. Weekly reports were submitted to the Township Committee until August 1959. At that time the reports were discontinued and the earlier reports were returned to

the defendant. Colonel Whitcomb testified that this course was followed because the defendant's security officer had determined that "the accumulation of a number of these reports constituted the revelation of information which would be injurious to the national security."

The defendant did engage a consultant to study sound levels and the possibility of designing and constructing a sound suppressor. This consultant testified that he conducted tests in the Lake Telemark area and concluded that the sound pressures were insufficient to produce damage to the nearby structures, but the plaintiffs strongly attack the nature and sufficiency of his tests along with his conclusion. In April 1959 a miniature device for sound suppression was constructed and successfully tested. Colonel Whitcomb testified that after the defendant received the final report in April 1959, it prepared "a comprehensive and formal proposal to the Air Force" for the construction and use of a noise suppressor on the rocket engine and that it was still awaiting approval from the Air Force. The plaintiffs attack the adequacy of the defendant's efforts in connection with the proposed noise suppressor and suggest that it could have proceeded expeditiously without awaiting Air Force action if it had been willing to expend its own funds. In his testimony enumerating the defendant's undertakings, Colonel Whitcomb concluded with the statement that the defendant had agreed that "it would not avoid any responsibility for legal claims." Mayor Vandermark's testimony was that the defendant had undertaken to compensate for "any property damage which could be attributed to the testing which was occurring at their test site." The Colonel and Mayor agreed that special damage complaints were to be honored if certified by the Rockaway Building Inspector and a reputable contractor to be mutually agreed upon by the township and the defendant. The Mayor stated that no contractor was ever mutually agreed upon because, he assumed, "no one ever formally presented a claim to the Rockaway Township governing body." The Building In-

spector testified that, pursuant to instructions from the Mayor, he did examine houses of complainants in the Lake Telemark area and found damage which, in his opinion, was caused by the vibrations resulting from the defendant's testing activities.

In September 1958 a petition seeking relief from the defendant's activities and bearing 185 signatures was presented to the Township Committee and this led to a meeting at which Colonel Whitcomb again spoke on the defendant's behalf. On September 17, 1958 the complaining residents formed the Rockaway Township Property Owners Association which sent protests to the Township Committee and later to the State Department of Health and the State Board of Education. On December 15, 1958 a meeting, attended by representatives of the Association and the defendant, as well as local school representatives, was held in the township. Following this meeting, representatives of the State Department of Health joined with local school representatives in an examination of the Malone School building and an inspection of it during the course of one of the defendant's tests. Their report indicated that there were no significantly adverse effects on the school but the plaintiffs point to testimony that the only test conducted by the defendant during the course of the inspection was of 10 seconds duration. On April 9, 1959 the plaintiffs filed their complaint against the defendant in the Law Division of the Superior Court. Originally there were 16 causes of action but one was voluntarily dismissed. The remaining 15 causes of action concerned 11 married couples and 4 unmarried persons. The complaints contained counts setting forth causes of action sounding in negligence, nuisance and trespass. After the filing of an answer and the entry of a pretrial order, the matter came on for trial in September 1960.

During the trial there was extensive testimony by the plaintiffs with respect to the defendant's activities and the resulting personal discomfort to them and the structural

damage to their homes. Some referred to the "terrific" noise which accompanied the defendant's tests and caused their homes to shake and objects to fall. Others testified that they could see the flames which accompanied the tests and compared the noise and vibration to "the concussion and intensity of a mortar barrage." There was testimony that dishes broke, beds shook, paintings fell, cracks developed and plaster dropped. The testimony with respect to damage included, *inter alia,* impaired foundations, seam openings and cracked floors, walls, ceilings, chimneys and fireplaces. Some plaintiffs testified that while tests were underway and they were feeling the vibrations, they could actually see new cracks appear and old cracks widen. Colonel Harrison A. Martin, a consulting engineer who testified as an expert for the plaintiffs, examined the cracks complained about by the plaintiffs and testified that in his opinion they were not settlement cracks but were caused by air blasts produced by the defendant's test firings. Mr. Joseph J. Lupinski, a building and general contractor who testified as an expert for the plaintiffs, also expressed the view that the cracks complained about by the plaintiffs were not settlement cracks. He submitted estimates as to the cost of repairs to the plaintiffs' homes resulting from the defendant's testing activities. His estimates ranged from $120 to $3,560 for individual plaintiffs and the aggregate for all of the plaintiffs was $25,605.

The testimony on the defendant's behalf included references to the activities reported upon by Colonel Whitcomb and descriptions of the test firings by the manager and a staff engineer of its Testing Department. In addition there was testimony by Father Joseph Lynch, the seismographic consultant, and by Mr. Kenneth Eldred, the consultant on sound levels. At the request of the defendant, Mr. Sidney M. Schwarz appraised each of the plaintiffs' property at its fair value assuming it had no observable defects, and its fair value in the light of its observable defects, the difference representing his view as to the diminution in value

because of the defects. His testimony of the diminution ranged from $50 to $800 for individual plaintiffs and the aggregate for all of the plaintiffs was $3,700. At the close of the plaintiffs' testimony the defendant moved successfully for elimination of the plaintiffs' negligence claims. At that time the court denied the defendant's motion to dismiss the claims grounded on nuisance and trespass and for punitive damages. At the close of all of the testimony the defendant again moved to strike the claims grounded on nuisance and trespass and for punitive damages. The court struck the trespass claims but not the remainder. After receiving the court's charge and completing its deliberations, the jury returned its verdict for all the plaintiffs for compensatory damages in the aggregate sum of $25,605 and for punitive damages in the aggregate sum of $75,000. The defendant's appeal is from the judgment duly entered pursuant to this verdict.

In its attack on the award of compensatory damages, the defendant first stresses the utility of its activities and the reports it received from its experts. It then urges that there was legal error in the trial court's charge which, after referring to a landowner's obligation to avoid unreasonable interference with his neighbor's land (*Brownsey v. General Printing Ink Corp.,* 118 *N. J. L.* 505, 508 (*Sup. Ct.* 1937); *Sans v. Ramsey Golf & Country Club, Inc.,* 29 *N. J.* 438, 449 (1959)), set forth the textbook classifications of nuisances grounded on interference which may be negligent, intentional, or the result of abnormally dangerous activities. See *Prosser, Torts* 389 *et seq.* (*2d ed.* 1955); *cf.* 1 *Harper and James, The Law of Torts* 64 *et seq.* (1956). We are here primarily concerned with the underlying considerations of reasonableness, fairness and morality rather than with the formulary labels to be attached to the plaintiffs' causes of action or the legalistic classifications in which they are to be placed. *Cf. Prosser, supra,* at *p.* 393. And we find from the record before us that the alleged error in the trial court's charge could not

have prejudiced the defendant and would not, in any event, call for reversal of the award of compensatory damages which was in the identical amount set forth by the plaintiffs' expert as the aggregate sum required to repair their homes.

Under the charge, the jury could not have found as they did unless they believed (as they had ample right to do under the testimony) that the defendant's conduct had caused the structural damage to the homes of the plaintiffs. That damage materialized after the complaining landowners had made the defendant aware that it was occurring. It may be assumed, for present purposes, that the defendant's activities were conducted with great care and had great public utility and that a court would hesitate to enjoin them notwithstanding the resulting structural damage to the neighboring property. But the issue before us is not whether there should be an injunction but whether the defendant may reasonably be expected to make monetary payment. On that issue there would appear to be little room for difference of opinion—every consideration of fairness and justness dictates that the defendant at least make its neighbors whole for the structural damage it caused. Professor Keeton in his article on "Trespass, Nuisance, and Strict Liability," 59 *Colum. L. Rev.* 457, 470 (1959), points out that when a defendant is put on notice that his conduct, such as blasting or other dangerous activity, is causing damage to neighbors' homes, the question is whether he may destroy another's property "to serve his own and the public interest." The Professor notes that "the answer would seem clearly to be that the enterprise that must do such physical damage is liable therefor, however socially desirable the actor's conduct might be, even though the operations might not be enjoinable." See *Whitney v. Ralph Myers Contracting Corporation,* 118 *S. E.* 2d 622 (*W. Va.* 1961); *Whitman Hotel Corp. v. Elliott & Watrous Eng. Co.,* 137 *Conn.* 562, 79 *A.* 2d 591 (1951); *Thigpen v. Skousen & Hise,* 64 *N. M.* 290, 327 *P.* 2d 802 (1958); *Brooks v. Ready Mix*

*Concrete Co.,* 94 *Ga. App.* 791, 96 *S. E. 2d* 213 (1956); *Fontenot v. Magnolia Petroleum Co.,* 227 *La.* 866, 80 *So. 2d* 845 (1955); *Federoff v. Harrison Const. Co.,* 362 *Pa.* 181, 66 *A. 2d* 817 (1949); *Brown v. L. S. Lunder Const. Co.,* 240 *Wis.* 122, 2 *N. W. 2d* 859 (1942). In *Harper, Torts* § 203, at *p.* 408 (1933) the author, in discussing the strict liability generally imposed on those engaged in blasting and similar operations, has this to say:

"Defendant is not regarded as engaging in blameworthy conduct. He is creating hazards to others, to be sure, but they are ordinary, and reasonable risks incident to desirable social and economic activity. But common notions of fairness require that the defendant make good any harm that results even though his conduct is free from fault." See also 2 *Harper and James, supra,* at *p.* 816.

See *McAndrews v. Collerd,* 42 *N. J. L.* 189 (*E. & A.* 1880); *Thompson v. Jannarone Contracting Co.,* 6 *N. J. Misc.* 320, 141 *A.* 25 (*Sup. Ct.* 1928); but *cf. Simon v. Henry,* 62 *N. J. L.* 486 (*Sup. Ct.* 1898); *Whitla v. Ippolito,* 102 *N. J. L.* 354 (*E. & A.* 1926). See also *Majestic Realty Associates, Inc. v. Toti Contracting Co.,* 30 *N. J.* 425, 433–436 (1959).

In *Whitman Hotel Corp. v. Elliott & Watrous Eng. Co., supra,* the defendant entered into a contract with the United States War Department, Corps of Engineers, to widen and deepen the channel of the Shetucket River. In the course of its activity it discharged dynamite blasts over a period of some months. The vibrations from the blasts caused damage to the pipes, walls and floors of the plaintiff's hotel. The plaintiff instituted an action for damages and the trial court, finding that the defendant had caused the damage though it had not been negligent, allowed recovery for the cost of the repairs. The action of the trial court was sustained by the Supreme Court of Errors of Connecticut in an opinion which pointed out that, although there are some decisions to the contrary, most decisions hold such defendants absolutely liable for damage caused to neighboring property and draw no distinction between instances where the damage

is caused by vibrations and instances where it is caused by falling rocks or other debris. See Annot., 20 *A. L. R. 2d* 1372 (1951) ; 38 *Brooklyn L. Rev.* 177 (1961) ; *cf.* Annot., 79 *A. L. R. 2d* 966 (1961). In the course of his opinion, Judge Inglis pointed out that today's substantive law should not turn on historical distinctions between trespass and trespass on the case and that "considerations of public policy do not require immunity from liability for damages caused by concussion or vibration any more than from liability for damages caused by flying debris." 79 *A. 2d,* at *p.* 595. It was readily conceded by the defendant that if flying debris had caused the damage it would be liable without regard to the extent of its precautionary steps. See 2 *Harper and James, supra* § 14.6, at *p.* 813; *cf. Federoff v. Harrison Const. Co., supra,* 362 *Pa.* 181, 66 *A. 2d,* at *p.* 817; *Brown v. L. S. Lunder Const. Co., supra,* 240 *Wis.* 122, 2 *N. W. 2d,* at *pp.* 860–861; *Wallace v. A. H. Guion & Company,* 237 *S. C.* 349, 117 *S. E. 2d* 359 (1960) ; 3 *Restatement, Torts* § 520, *p.* 44 (1938).

In *Whitney v. Ralph Myers Contracting Corporation, supra,* the defendant was performing a contract with the State Road Commission for the grading of a project in connection with the construction of a highway. It blasted through rock and the resulting vibrations damaged the plaintiff's home. In sustaining a verdict for the plaintiff, the Supreme Court of Appeals of West Virginia rejected the contention that the defendant should not be held liable if it used due care in its blasting operations; in the course of its opinion the court embraced fully the view set forth in *Harper, supra,* that fairness requires that the defendant make good the harm he caused even though he was without fault, and then had this to say:

"Little, if any, difference in the authorities exists in cases of damages resulting from blasting operations where rock or other debris is cast on the premises of a third party, it being almost universally held that liability exists, without negligence. We can see no practical or warranted distinction between such cases and cases where

damages result from vibrations caused by blasting operations. One is as much a trespass as the other. The damages caused a plaintiff are as real in one case as in the other." 118 *S. E. 2d,* at *p.* 626.

*Cf. Benton v. Kernan,* 130 *N. J. Eq.* 193, 196 (*E. & A.* 1941).

In *Fontenot v. Magnolia Petroleum Co., supra,* the defendants used explosives while conducting geophysical observations in the vicinity of the plaintiffs' homes. The plaintiffs testified that the resulting vibrations caused cracks in their walls and ceilings and breaks in the concrete foundations and porch floors. The defendants presented evidence that their operations were in accord with the "customary and approved methods of conducting such explorations" and their experts testified that, considering the distances separating the points of the explosions from the homes of the plaintiffs, it would have been "scientifically impossible" for the blasts to have produced vibrations or concussions sufficient to cause the alleged damage. The Supreme Court of Louisiana sustained the finding for the plaintiffs and held that the defendants' responsibility for the damage was absolute and not dependent on any failure to use due care. It took the position that there could be no legal justification to relieve the defendants of liability, and thereby deny "compensatory damages to one having no relation to the conducting of such business and thus compel him to bear the unwarranted loss." 80 *So. 2d,* at *p.* 849.

In *Ellison v. Walker,* 281 *P. 2d* 931 (*Okl.* 1955), the defendant drilled and operated an oil and gas well in the vicinity of the plaintiff's property. The plaintiff alleged that vibrations from the defendant's activities caused his house foundation to sink and the plaster to crack. He sought damages and the jury returned a verdict in his favor. This was sustained by the Supreme Court of Oklahoma. The court, after referring to the defendant's testimony that the vibrations resulting from its activities were not sufficient to cause any substantial damage to the plaintiff's

property, noted that there were unquestionably some vibrations and that it was for the jury to determine from the conflicting evidence whether the vibrations were transmitted with such force as to do substantial damage. 281 *P. 2d,* at *p.* 932. On the issue raised by the defendant as to the proper measure of damages recoverable by the plaintiff, the court held that, under the circumstances, the plaintiff was entitled to recover "the reasonable cost of repairing the damage or restoring the property to its former condition." 281 *P. 2d,* at *p.* 933. See also *Whitman Hotel Corp. v. Elliott & Watrous Eng. Co., supra,* 79 *A. 2d,* at *pp.* 596–597; *cf.* 2 *Harper and James, supra,* § 25.6, at *p.* 1311.

The cited blasting cases embody current notions as to what is right and just. They recognize that although careful blasting may not involve an unreasonable risk of harm and should therefore not be entirely prohibited, it nonetheless is an ultrahazardous activity which introduces an unusual danger into the community and should pay its own way in the event it actually causes damage to others. See 2 *Harper and James, supra,* at *p.* 814; 3 *Restatement, supra,* § 520, at *p.* 44. A business enterprise which engages in blasting operations knows that despite the precautions it takes, neighboring properties may be damaged. If damage does occur, it should in all fairness be absorbed as an operating business expense, for the enterprise may not reasonably expect its wholly innocent neighbors to shoulder the loss. It seems to us that the foregoing considerations apply with even greater force to the case at hand. The extraordinary activities of the defendant may readily be classed as ultrahazardous and, unlike the situation in many of the blasting cases, the significant structural damage resulted from their continuation after receipt of repeated complaints from the neighboring landowners. See Freedman, "Nuisance, Ultrahazardous Activities, and The Atomic Reactor," 30 *Temp. L. Q.* 77, 90–104 (1957); *cf. Keeton, supra,* 59 *Colum. L. Rev.,* at *p.* 470.

 We are entirely satisfied that the jury did not exceed its proper function in awarding compensatory damages and come now to the defendant's next contention that their measure was improper. See 525 *Main Street Corp. v. Eagle Roofing Co.*, 34 *N. J.* 251, 254 (1961); cf. *Barberi v. Bochinsky*, 43 *N. J. Super.* 186, 190 (*App. Div.* 1956); *Bates v. Warwick*, 77 *N. J. L.* 387, 388 (*Sup. Ct.* 1909); *Manda v. Orange*, 77 *N. J. L.* 285, 286 (*Sup. Ct.* 1909), affirmed 78 *N. J. L.* 630 (*E. & A.* 1910). See also *Rempfer v. Deerfield Packing Corp.*, 4 *N. J.* 135, 147 (1950); *Newman v. Pasternack*, 103 *N. J. L.* 434, 438 (*E. & A.* 1927). The trial court charged that the measure of compensatory damages was the reasonable value of the repairs and the jury accepted the testimony of the plaintiffs' expert on this score. The defendant contends that the proper measure was the diminution in value of the plaintiffs' property by reason of the defendant's activity and there are New Jersey decisions which have so indicated. However those decisions recognized that the reasonable cost of repairs could be considered by the jury, and in 525 *Main Street Corp. v. Eagle Roofing Co., supra,* this court recently suggested that, in appropriate circumstances, the reasonable cost of repairs may be taken as the proper measure of damages. There the trial court found that the defendant had breached its covenant to repair a roof on an industrial structure and the single issue presented on appeal was one of damages. The defendant contended that the controlling rule was the difference between the value of the building with the defective roof and the value of the building if the covenant had been performed; but this contention was rejected and the cost of repairing the defective roof was accepted as the proper measure of damages. See *States Exploration Company v. Reynolds*, 344 *P.* 2d 275, 279 (*Okl.* 1959); 15 *Am. Jur., Damages* § 113, p. 524 (1938); 25 *C. J. S. Damages* § 84, p. 604 (1941).

 In its treatment of the measure of damages where harm is done to personal property, the *Restatement of Torts*

(§ 928) provides that the plaintiff be given an option to recover either the diminution in value or the reasonable cost of repairs. See 2 *Harper and James, supra* § 25.6, at p. 1312; *cf.* 4 *Restatement, supra* § 929. In *Washington Air Comp. Rent. Co. v. National U. Ins. Co.,* 165 *A.* 2d 482, 485 (*D. C. Mun. Ct. App.* 1960), the court, suggesting that the measure should be the same in real and personal property cases, accepted the reasonable cost of repairs as a proper measure of the real property damage which had resulted from blasting. In many other blasting cases, the compensatory awards have been realistically measured by the reasonable cost of repairs. See, *e. g., Ellison v. Walker, supra, Whitman Hotel Corp. v. Elliott & Watrous Eng. Co., supra; Fitzsimons & Connell Co. v. Braun,* 199 *Ill.* 390, 65 *N. E.* 249, 251, 59 *A. L. R.* 421 (1902). It seems to us that this approach makes good sense and will operate with special effectiveness under circumstances such as those presented here. The repairs to the plaintiffs' homes involve the correction of impaired foundations, seam openings and cracked floors, walls, ceilings, chimneys and fireplaces. They simply entail the restoration of the homes to their condition immediately prior to the defendant's activities. The plaintiffs are concerned with living in rather than selling their homes and, in all fairness, they should have the right to recover the reasonable cost of the necessary repairs without being subjected to the artificial burden of establishing that the diminution in the salable value of their homes was in a corresponding amount. *Cf. Bates v. Warwick, supra,* 77 *N. J. L.,* at *p.* 388; *McCormick, Damages* § 126, *p.* 483 (1935).

■■ The plaintiffs do not attack the sufficiency of the compensatory damages awarded to them. But they do assert that they are entitled to retain their awards for punitive damages, whereas the defendant asserts that the trial court should have, at the close of the testimony, stricken the punitive damage claims. In tort law, damages are generally intended to compensate rather than punish. In exceptional

instances, courts have recognized awards above full compensation "for the purpose of punishing the defendant, of teaching him not to do it again, and of deterring others from following his example." See *Prosser, supra,* at *p.* 9. Such exemplary awards are often described as punitive damages and sometimes as smart money. See *McCormick, supra,* at *p.* 275. Although many have criticized punitive damages as having no proper place in tort law, others have defended them and they are well recognized throughout the states. See *McCormick, supra,* at *pp.* 275 *et seq.; Morris, Punitive Damages in Tort Cases,* 44 *Harv. L. Rev.* 1173 (1931). However, they admittedly are not to be applied in the ordinary unaggravated tort case whether it be grounded on strict liability or fault. See *Prosser, supra,* at *pp.* 9–10:

"Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that his conduct may be called willful or wanton. Lacking this element, mere negligence, however 'gross,' is generally held not to be enough."

In *La Bruno v. Lawrence,* 64 *N. J. Super.* 570 (*App. Div.* 1960), certif. denied 34 *N. J.* 323 (1961), the Appellate Division dealt with a trespass action grounded on the wrongful erection of a fence on the plaintiff's property. In considering the award of punitive damages, the court cited earlier New Jersey decisions and accurately summarized them as follows:

"The cases would thus seem to indicate that one or the other of two factors must be found before punitive damages can be awarded in a suit for trespass to real property, *viz.*: (1) actual malice, which is nothing more or less than intentional wrongdoing—an evil-minded act; or (2) an act accompanied by a wanton and willful disregard of the rights of another. Clearly, each case must be governed by its own peculiar facts. Accordingly, we must examine the facts herein, as to each of the defendants, in order to decide the validity of the award of punitive damages in this case." 64 *N. J. Super.,* at *p.* 575.

Professor McCormick suggests that in order to satisfy the requirement of willfulness or wantonness there must be a "positive element of conscious wrongdoing." See *McCormick, supra,* at *p.* 280. Our cases indicate that the requirement may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences. See *King v. Patrylow,* 15 *N. J. Super.* 429, 433 (*App. Div.* 1951); *cf. Krauth v. Israel Geller and Buckingham Homes, Inc.,* 31 *N. J.* 270, 277 (1960); *Egan v. Erie R. Co.,* 29 *N. J.* 243, 255 (1959); *Tidewater Oil Co. v. Camden Securities Co.,* 49 *N. J. Super.* 155, 164 (*Ch. Div.* 1958). See also *Staub v. Public Service Railway Co.,* 97 *N. J. L.* 297, 300 (*E. & A.* 1922). The plaintiffs contend that they have made such a showing and that consequently punitive damages are warranted. We find otherwise and are satisfied from the totality of the evidence that it could not reasonably be found that the defendant's conduct was willful or wanton.

It may well be that the defendant could have exercised greater care and diligence, perhaps in the selection and arrangement of the testing sites and stands, in the development of the sound suppressor, and in the course of its other activities. But that would merely indicate negligence and would be a far cry from the plaintiffs' charge of deliberate conduct with knowledge of high probability of harm and reckless indifference to consequences. After it began its testing, the defendant took sound decibel readings and received favorable reports from its seismographic consultant and its consultant in sound levels. Its representatives met repeatedly with the complainants and local officials and it agreed to undertake various steps to alleviate the complaints. It eliminated excess ammonia fumes through the installation of a burner, it curtailed testing hours until the Air Force insisted that it step up its program, and it agreed to an informal arrangement for the submission and determination of claims. It initiated steps

to ascertain the feasibility of a sound suppressor, constructed and tested a miniature device for sound suppression, and submitted a comprehensive proposal to the Air Force for approval. It met with school officials and arranged a test which evidenced no structural damage to the school. Throughout all of the foregoing, it acted, so far as the record before us shows, in good faith and in the conscientious endeavor to lessen the danger of damage and inconvenience to its neighbors. While we are clear that it was fairly held accountable for the structural damage it actually caused, there would be no justice in punishing it through the imposition of smart money. *Cf. La Bruno v. Lawrence, supra,* 64 *N. J. Super.,* at *pp.* 577–579; *Tidewater Oil Co. v. Camden Securities Co., supra,* 49 *N. J. Super.,* at *p.* 164. The defendant's motion to strike the claims for punitive damages should have been granted, and, accordingly, the award of damages beyond compensation is vacated.

██ We find no merit in the other points raised by the defendant and consider it unnecessary to discuss any of them except the defendant's contention that in the absence of negligence "it is not liable for damage resulting from the performance of its contract with the United States." Much the same position is taken by the United States which asserts in its brief *Amicus Curiae* that it has title to the rocket engine. For present purposes we may assume that if the tests had been conducted by the Government itself, the plaintiffs' damage claims would be forestalled by the Government's sovereign immunity and that the Federal Tort Claims Act would be restrictively construed as insufficient to cover them. See *Dalehite v. United States,* 346 *U. S.* 15, 73 *S. Ct.* 956, 97 *L. Ed.* 1427 (1953); *cf.* 2 *Harper and James, supra,* §§ 29.14, 29.15. But here the tests were not undertaken by the Government itself and the plaintiffs are not asserting any claims against the Government. They are asserting claims against an independent contractor which was engaged in a profit-making undertaking and which could readily be expected to make

suitable provision for damage claims whether they arose from negligence or strict liability. The suggestion that the independent contractor might pass on to the Government the amount of his insurance premium or other costs in connection with damage claims arising from strict liability would not appear to have any controlling significance; when dealing with negligence claims where the independent contractor might likewise pass on his premium or related costs he admittedly may not take advantage of the Government's immunity. See *Palin v. General Construction Company*, 47 *Wash.* 2d 246, 287 *P.* 2d 325, 328 (1955); *State Const. Co. v. Johnson*, 82 *Ga. App.* 698, 62 *S. E.* 2d 413, 414 (1950); Annot., 69 *A. L. R.* 489, 492 (1930); *cf. James Stewart & Co. v. Sadrakula*, 309 *U. S.* 94, 105, 60 *S. Ct.* 431, 84 *L. Ed.* 596, 603 (1940); *Alabama v. King & Boozer*, 314 *U. S.* 1, 62 *S. Ct.* 43, 86 *L. Ed.* 3 (1941). Extension of the Government's immunity to independent contractors would run counter to recent trends and expressions which emphasize the need for restricting the immunity and the rightness of affording relief to those who suffer special damage without regard to whether the activity which caused the damage was governmental or private. See *McCabe v. N. J. Turnpike Auth.*, 35 *N. J.* 26, 33 (1961); *Taylor v. N. J. Highway Authority*, 22 *N. J.* 454, 470 (1956); *cf. Schwartz v. Stockton*, 32 *N. J.* 141, 147 (1960); *Cloyes v. Delaware Tp.*, 23 *N. J.* 324, 327 (1957). See also, *Griggs v. Allegheny County*, 369 *U. S.* 84, 82 *S. Ct.* 531, 7 *L. Ed.* 2d 585 (1962); *United States v. Causby*, 328 *U. S.* 256, 66 *S. Ct.* 1062, 90 *L. Ed.* 1206 (1946); *cf. Malone v. Bowdoin*, 369 *U. S.* 643, 82 *S. Ct.* 980, 8 *L. Ed.* 2d 168 (1962) (Douglas, J., dissenting).

In *Ashville Const. Co. v. Southern Ry. Co.*, 19 *F.* 2d 32 (4 *Cir.* 1927) and *Scranton v. L. G. DeFelice & Son*, 137 *Conn.* 580, 79 *A.* 2d 600 (1951), strict liability was imposed upon independent contractors whose blasting activities damaged nearby property. The courts held that although the activities of the contractors were pursuant to their

state contracts, the governmental immunity of the states could not be asserted by the contractors. *Cf. Lydecker v. Freeholders of Passaic,* 91 *N. J. L.* 622, 627 (*E. & A.* 1917). The defendant cites expressions which may point to the contrary, including those in *Valley Forge Gardens v. James D. Morrissey, Inc.,* 385 *Pa.* 477, 123 *A.* 2d 888 (1956) and *Pumphrey v. J. A. Jones Construction Company,* 250 *Iowa* 559, 94 *N. W.* 2d 737 (1959), adversely commented upon in 12 *Stan. L. Rev.* 691 (1960). See *Yearsley v. W. A. Ross Construction Co.,* 309 *U. S.* 18, 60 *S. Ct.* 413, 84 *L. Ed.* 554 (1940); *Benner v. Atlantic Dredging Co.,* 134 *N. Y.* 156, 31 *N. E.* 328, 17 *L. R. A.* 220 (1892); 43 *Am. Jur., Public Works and Contracts* § 83, *p.* 827 (1942). In *Valley Forge Gardens* a state contractor was held not liable for damage resulting from its construction of a highway fill. It was not charged with negligence and it "affirmatively proved that all of its work had been done in strict accordance with the contract and the plans and specifications" drawn by the State Highway and Bridge Authority. See 123 *A.* 2d, at *p.* 889. In *Pumphrey* the defendants were held not liable for damage resulting from their blasting activities in the course of their performance of a contract with the United States Government. There was no charge of negligence; and it was stipulated that the defendants had performed as provided in the contract and the plans and specifications, that their blasting methods were submitted to the Government and approved by it and became part of the plans and specifications of the contract, that "the work of blasting was performed under the inspection of governmental employees," and that "there was no deviation from the contract in doing said blasting." 94 *N. W.* 2d, at 738.

The circumstances in *Pumphrey* and *Valley Forge Gardens* are not at all comparable to those presented here for there is nothing in this case to indicate that the government had prescribed the site of the tests, or the location of the test stands, or the manner of conducting the tests.

See *Converse v. Portsmouth Cotton Oil Refining Corp.*, 281 *F.* 981 (4 *Cir.* 1922), *cert.* denied 260 *U. S.* 724, 43 *S. Ct.* 13, 67 *L. Ed.* 482 (1922) ; *Whitney v. Ralph Myers Contracting Corporation, supra.* .The contracts between the defendant and the United States were not introduced. during the trial and are not before us. Indeed at no point during the trial did the defendant assert any defense based upon an immunity or an alleged nonliability for damage resulting from the performance of its contracts with the United States. If the defendant had intended to rely on any such defense, it should have asserted it in the trial court (*R. R.* 4 :8–3) and should have introduced its contracts along with evidence bearing on the performance of their terms. The defendant is in no position to seek to raise the defense for the first time on appeal or to have this court go beyond the confines of the trial record in order to determine it in its favor. See *Gibraltar Factors Corp. v. Slapo,* 23 *N. J.* 459, 461 (1957), appeal dismissed 355 *U. S.* 13, 78 *S. Ct.* 44, 2 *L. Ed.* 2d 20 (1957) ; *Mancuso v. Rothenberg,* 67 *N. J. Super.* 248, 257 (*App. Div.* 1961) ; *Yoerg v. Northern New Jersey Mtg. Associates,* 44 *N. J. Super.* 286, 289 (*App. Div.* 1957) ; *Ex-Cell-o Corp. v. Farmers Coop. Dairies Ass'n.,* 28 *N. J. Super.* 159, 161 (*App. Div.* 1953).

In *Converse v. Portsmouth Cotton Oil Refining Corp., supra,* the defendant entered into a dredging contract with the United States. During the course of its work it dumped materials which escaped from the dumping grounds into a nearby creek and caused injury to the plaintiff's business and plant. The plaintiff sued the defendant which contended that it was .under no liability for incidental damage resulting from its performance of work in accordance with Government directions. The court indicated that this defense might be sound if the defendant's work could not have been done without inflicting the injury; however, it then proceeded to find for the plaintiff, pointing out that the defendant could have used other dumping grounds which were available "subject only to approval of the officer in

charge." 281 *F.*, at *p.* 985. *Cf. Meier v. Frank Mashuda Company,* —— *Ohio App.* ——, 168 *N. E.* 2d 319, 321 (1959). In *Whitney v. Ralph Myers Contracting Corporation, supra,* the court rejected an independent contractor's claim that he was entitled to the benefit of the state's immunity as a defense against the plaintiff's claim for damages resulting from nonnegligent blasting operations in the course of state highway construction. Judge Given pointed out that while the use of explosives was within the contemplation of the contracting parties, there was nothing to indicate that the manner of its use was not left to the judgment and discretion of the contractor or that the work could not have been done so as to have avoided the damages. See 118 *S. E.* 2d 628. The considerations expressed in *Converse* and *Whitney* would seem to be fully applicable here and to lead, in themselves, to the rejection of the defendant's claim of immunity or nonliability grounded on the fact that its testing was undertaken pursuant to contracts with the United States Government.

The judgment for compensatory damages in the aggregate sum of $25,605 is affirmed; the judgment for punitive damages in the aggregate sum of $75,000 is reversed; costs in this court are allowed to the plaintiffs.

*For affirmance in part and reversal in part*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.