**Anthony GONCALVES and Clara Goncalves**

v.

**EAGLE–PICHER INDUSTRIES, INC.**

**Civ. A. No. 83–999.**

United States District Court,
E.D. Pennsylvania.

April 15, 1985.

Martin Greitzer, Greitzer & Locks, Philadelphia, Pa., for plaintiffs.

James V. Bielunas, Thompson & Pennell, Philadelphia, Pa., for defendant.

## MEMORANDUM

LOUIS H. POLLAK, District Judge.

Plaintiffs Anthony and Clara Goncalves seek compensatory and punitive damages for injuries allegedly caused by asbestos products which defendant Eagle-Picher Industries manufactured. According to the Amended Complaint, Anthony Goncalves worked as a pipefitter and chemical operator for GAF Corporation in Linden, New Jersey, from 1963 to 1971; Mr. Goncalves also worked as a pipefitter and insulator for the American Cyanimid Corporation in Linden from 1972 to 1981. Amended Complaint ¶ 8. Plaintiffs allege that, during this eighteen-year period, Mr. Goncalves "continually worked with, used and was ... exposed to the defendant's asbestos products." *Id.* That exposure has allegedly caused plaintiff to contract asbestosis.

Defendant Eagle-Picher has moved for partial summary judgment on three of plaintiffs' claims against it:. (1) the conspiracy claim contained in count IV of the Complaint, (2) the fraud claim, also contained in count IV, and (3) the claim for punitive damages. Plaintiffs do not oppose the motion insofar as it regards the claims for conspiracy and fraud.[1] Accordingly, Eagle-Picher's motion will be granted as unopposed with respect to those claims.

The punitive damages portion of Eagle-Picher's motion is contested. Eagle-Picher has submitted the affidavit of Robert L. Bockstahler, the former President and General Manager of Eagle-Picher's Chemical and Fibers Division. In addition, both sides have submitted copies of various letters and memoranda written by or to Eagle-Picher personnel with regard to asbestos. Finally, plaintiffs have submitted partial copies of several articles, found in Eagle-Picher's Research Library, having to do with asbestos-related health hazards.

The parties differ, of course, in the conclusions they draw from this factual record. In addition, they differ somewhat with regard to the applicable legal standard. I shall discuss both the legal standard and its application to this record, but before reaching either issue, I must determine whether, under the applicable law, punitive damages are available in products liability actions.

## I. *Availability of Punitive Damages*

■ It is undisputed that a Pennsylvania court would hold that the substantive law of New Jersey governs this action. New Jersey is the state of plaintiffs' residence and the state in which Anthony Goncalves suffered both his exposure to asbestos and the resulting injuries. Amended Complaint ¶¶ 1a, 8. Accordingly, it is the state which, under Pennsylvania choice of law rules, has the greatest interest in the outcome of this litigation. *Kelly v. Johns-Manville Corp.*, 590 F.Supp. 1089, 1094–95 (E.D.Pa.1984).

■ There is some disagreement as to whether punitive damages are available in a New Jersey products liability action. *Compare Gold v. Johns-Manville Sales Corp.*, 553 F.Supp. 482 (D.N.J.1982) (Acker-

---

**1.** In briefing and arguing Eagle-Picher's motion, plaintiffs have treated the motion as solely directed to the punitive damages claim.

man, J.) (punitive damages unavailable in strict liability actions); *Wolf v. Procter & Gamble Co.*, 555 F.Supp. 613, 618 & n. 1 (D.N.J.1982) (Fisher, C.J.) (same) *with Gogol v. Johns-Manville Sales Corp.*, 595 F.Supp. 971, 975–76 (D.N.J.1984) (Gerry, J.) (punitive damages available in strict liability actions); *Cinnaminson Township Board of Education v. U.S. Gypsum Co.*, 552 F.Supp. 855, 863 (D.N.J.1982) (Thompson, J.) (same). A recent decision of the Appellate Division of the New Jersey Superior Court, *Fischer v. Johns-Manville Corp.*, 193 N.J.Super. 113, 472 A.2d 577, 581–87 (App.Div.) (same), *certification granted*, 97 N.J. 598, 483 A.2d 137 (1984). Holding that punitive damages can be had in a products liability case, is now pending before the New Jersey Supreme Court. My role is to predict what that court will rule.[2] *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 661–63 (3d Cir.), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). *See also Novosel v. Nationwide Ins. Co.*, 721 F.2d 894, 897 (3d Cir.1983); *Becker v. Interstate Properties*, 569 F.2d 1203, 1205–06 & nn. 5–8 (3d Cir. 1977), *cert. denied*, 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978).

In *Gold v. Johns-Manville Sales Corp.*, 553 F.Supp. 482 (D.N.J.1982), Judge Ackerman predicted that New Jersey would not allow punitive damages in actions based purely on strict liability, because (1) punitive awards would artificially raise the price consumers pay for the affected goods, and (2) such awards are "concerned with [defendants'] normative behavior," and would therefore confuse a jury charged according to strict liability principles. 553 F.Supp. at 484–85. Judge Fisher adopted this reasoning in *Wolf v. Procter & Gamble Co., supra*, 553 F.Supp. at 618 & n. 1. Both *Gold* and *Wolf* preserve plaintiffs' right to present punitive damages claims in cases in which negligence as well as strict liability is alleged. *Gold, supra*, 552 F.Supp. at 485; *Wolf, supra*, 553 F.Supp. at 618. Under both decisions,

however, punitive damages are unavailable in cases based solely on strict liability.

Plaintiffs in this case press both negligence and strict liability claims. Accordingly, even under *Gold* and *Wolf*, punitive damages are legally available on plaintiffs' negligence claims, given sufficient proof of egregious conduct.

*Gold* and *Wolf* would not permit plaintiffs to assert punitive damages claims on their strict liability counts. However, two cases decided since *Gold* and *Wolf* have concluded that New Jersey law permits punitive awards even where liability is based solely on section 402A of the Second Restatement of Torts. In *Fischer v. Johns-Manville Corp., supra*, the case now under review in the New Jersey Supreme Court, the Appellate Division of the New Jersey Superior Court expressly considered the arguments advanced in *Gold*, and concluded that *Gold* misapprehended applicable New Jersey precedent. 472 A.2d at 583–84. The court went on to decide that punitive damages serve the same policy goals in products liability actions as in other kinds of tort cases:

> With respect to the public policy considerations implicated in allowing punitive damages in products liability cases, we concur with the judicial consensus that if punitive damages are awarded only in egregious situations, the public interest, on balance, is better served by allowing such an award than by precluding it. As we have noted, the underlying purpose of punitive damages is both to punish the offender and to deter him and others from engaging in similar conduct. Both punishment and deterrence are appropriate responses to a supplier of defective goods who has knowledge of the high degree of risk of grave harm to which they will subject the public but who nevertheless makes the cynical, conscious business decision to place and keep them on the market. Were punitive damages to be withheld, those entrepreneurs who act with flagrant disregard of

---

**2.** Argument was heard in *Fischer* on November 5, 1984. As of the date this Memorandum was filed, the Supreme Court had not rendered its decision.

the public safety would be able to write off the public's injury as a cost of doing business by the payment of compensatory damages, for which there is typically insurance coverage. One court has described this practice as the 'coldblooded calculation' that it is more profitable to pay claims than to cure the defect.... Thus, it is only the threat of punitive damages which can ultimately induce these entrepreneurs and others to act with a reasonable modicum of responsibility.

*Id.* at 584 (citations omitted).[3] *Fischer* was decided in January 1984. Nine months later, in *Gogol v. Johns-Manville Sales Corp., supra,* Judge Gerry decided that, in light of *Fischer,* Judge Ackerman's ruling in *Gold* incorrectly predicted how the New Jersey Supreme Court would rule on the issue. 595 F.Supp. at 975–76.

Like Judge Gerry, I find *Fischer* persuasive. As the *Fischer* court noted, the weight of authority in other jurisdictions is strongly in favor of allowing punitive awards in strict liability actions. *Id.* 472 A.2d at 582–83 (citing cases); *Annot.,* 13 A.L.R.4th 52 (1982). A recent instance is the Third Circuit's articulation of Virgin Islands law in *Acosta v. Honda Motor Co.,* 717 F.2d 828 (3d Cir.1983), which took issue with Judge Ackerman's conclusion in *Gold, supra,* that, as a general matter, products liability defendants would be able to "pass on" punitive damage awards to consumers. *See id.* at 835–36. I conclude that the New Jersey Supreme Court will determine that punitive damages are available in 402A cases according to the same standard applied in negligence cases. *See also Neal v. Carey Canadian Mines,* 548 F.Supp. 357, 375–78 (E.D.Pa.1982) (applying Pennsylvania law).

## II. The Legal Standard for Punitive Damages Under New Jersey Law

■ The leading New Jersey case on the standard for awarding punitive damages is *Berg v. Reaction Motors Division,* 37 N.J.

396, 181 A.2d 487 (1962). In *Berg,* a government contractor caused structural damage to a number of houses in the course of testing rocket engines. (The damage to the houses was apparently caused by sound waves.) Plaintiff homeowners sued the contractor; at trial, plaintiffs were awarded a total of $25,605 in compensatory damages and $75,000 in punitive damages. 181 A.2d at 491–92. The New Jersey Supreme Court unanimously reversed the punitive award. The court noted that punitive damages are awarded to punish a defendant for "willful and wanton" conduct. By way of defining what is meant by "willful and wanton," the court stated: "Our cases indicate that the requirement may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." *Id.* at 496 (citations omitted). The conduct of the contractor in *Berg* did not satisfy this standard, because the contractor took steps to deal with the sound problems occasioned by its testing of rocket engines. *Id.* at 496–97.

The *Berg* standard—"knowledge of a high degree of probability of harm" coupled with "reckless indifference to consequences"—has been consistently cited and applied by New Jersey courts in the twenty-three years since *Berg* was decided. *See, e.g., Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 477 A.2d 1224, 1230 (1984); *DiGiovanni v. Pessel,* 55 N.J. 188, 260 A.2d 510, 512 (1970); *Fischer v. Johns-Manville Corp.,* 193 N.J.Super. 113, 472 A.2d 577, 581 (App.Div.1984); *Stern v. Abramson,* 150 N.J.Super. 571, 376 A.2d 221, 223 (Law Div.1977). In *Fischer, supra,* the New Jersey Superior Court applied this standard to a strict liability action against assorted sellers of asbestos products. After holding that punitive damages were compatible with strict liability, *see* 472 A.2d at 582–86, *Fischer* proceeded to affirm punitive awards against Johns-Manville Corporation and Bell Asbestos

---

**3.** For a more explicitly economic approach along the same lines, see Cooter, *Economic*

*Analysis of Punitive Damages,* 56 So.Cal.L.Rev. 79 (1982).

Mines. *Id.* at 587–88. The court found ample justification for a finding that "both defendants, during the period of plaintiff's exposure, acted knowingly and deliberately in subjecting him as an asbestos worker to serious health hazards with utter disregard of his safety and well-being." *Id.* at 587.

Plaintiffs argue that these cases require only a showing of reckless indifference to the potential hazards of one's conduct in order to sustain a punitive award. The clear language of *Berg* says otherwise: "knowledge of a high degree of probability of harm *and* reckless indifference to consequences" are necessary to establish "willful and wanton" conduct. *Berg, supra,* 181 A.2d at 496 (emphasis added). Neither gross negligence nor recklessness suffices; rather, actual knowledge of the relevant risks must be shown. Thus, in *Fischer,* the court focused on evidence that the defendants were fully aware of the risk of asbestos-related disease as early as the 1930's, long before warnings were placed on their products. *Fischer, supra,* 472 A.2d at 587–88. Conversely, the *Berg* court noted that the defendant in that case received favorable results from its testing of sound levels, suggesting that the defendant was unaware of the "high probability" that its actions would injure buildings in the area. *Berg, supra,* 181 A.2d at 496–97. The analysis in both opinions shows that proof of defendant's knowledge is a prerequisite to a punitive award.

Accordingly, I find that, under New Jersey law, an award of punitive damages must be predicated on the twin findings of knowledge of the relevant risk of harm *and* reckless disregard for the consequences of incurring that risk. I turn now to the application of that standard to the record in this case.

### III. *Evaluation of the Evidence*

In support of its motion, defendant has submitted the affidavit of Robert L. Bockstahler, former President and General Manager of defendant's Chemical and Fibers Division. Mr. Bockstahler states that prior to 1964 (the year in which Eagle-Picher began placing warnings on its asbestos products), "the Company never received a warning from any of its medical or safety officers relating to potential hazards of asbestos-containing insulation products." Mr. Bockstahler further states that (1) Eagle-Picher "was not involved in any studies or experiments relating to the possible hazards of asbestos," (2) it did not receive such studies until after it ceased manufacturing asbestos products, and (3) no asbestos-related workers' compensation claims were filed against it until 1981, some ten years after it had ceased manufacturing asbestos products.

Mr. Bockstahler's affidavit, if uncontradicted, would suffice to carry defendant's burden under Rule 56(c). Plaintiffs are therefore required to come forward with affidavits or other exhibits showing that a genuine issue of material fact exists with regard to the question whether defendant (1) had knowledge of a high probability of harm arising out of its asbestos production, and (2), given such knowledge, acted with reckless indifference to the consequences of its actions. Fed.R.Civ.P. 56(e).

By way of meeting that burden, plaintiffs have introduced the following items:

(1) a memorandum written in 1942 by H.W. Aber, then a salesman for Eagle-Picher, in which Aber mentions a "very informative article discussing the health risks related to asbestos";

(2) a memorandum written in 1962 by J.P. Harrington, an Eagle-Picher employee, regarding the increased incidence of workers' compensation claims against asbestos-producing companies;

(3) portions of the deposition of Herman L. Huelster, another Eagle-Picher employee, regarding the implementation of warnings on Eagle-Picher products after 1964;

(4) two interoffice memoranda by W.F. McCarthy regarding the type size to be used for the warnings;

(5) a 1965 letter from Paul Losse, another Eagle-Picher employee, to Sun Shipbuilding, an Eagle-Picher customer, in which

Losse downplays the risks associated with asbestos products;

(6) a 1965 letter from Robert Alexander of Sun Shipbuilding asking Eagle-Picher for information regarding various product hazards;

(7) a 1968 letter from P.K. Maitra of Eagle-Picher to Shell Oil stating that Eagle-Picher products are not toxic; and

(8) portions of three medical publications found in Eagle-Picher's Research Library which discuss in general terms some of the health risks posed by asbestos exposure.

Plaintiffs argue that these items are sufficient to support a punitive damages verdict. Defendant contends that they provide no evidence whatever of the requisite knowledge of asbestos-related health risks. I do not face this question unaided. Both parties have offered, in support of their respective positions, a number of recent decisions in which other judges ruled on similar motions by Eagle-Picher. Two of these decisions bear directly on this case, because they apply New Jersey law and because they appear to consider much the same evidence as is before me in this case.[4]

In *Konrad v. H.W. Porter Co.*, No. L28838–80, Slip Op. (N.J.Super.Ct. Law Div., Middlesex County April 27, 1984), the court analyzed the Aber memorandum and the medical article to which it refers. As the court recognized, the chief subject of the Aber memorandum was not asbestos, but mineral wool. The memorandum relates Aber's discussion with a Mr. Wardlow of the Texas State Board of Health Laboratories regarding allegations by employers of Humble Oil & Refining Company (an Eagle-Picher customer) that mineral wool products were unsafe. In the fourth paragraph of the memorandum, Aber mentions that there is an article in *Occupation and Health* regarding asbestos. The memorandum then states, "If you think mineral wool's dangerous, you should read this," and explains how copies of the article might be obtained. The court in *Konrad*, after examining the article in question, concluded that the article discussed the risks of exposure to raw asbestos rather than finished products, and that the article's authors predicted that low levels of dust concentration would prove safe. Slip op. at 8–9, 13. Finding that the article was insufficient to support a punitive damages verdict, the court dismissed the punitive damages claim against Eagle-Picher. *Id.* at 13.[5]

In *Herber v. Johns-Manville Corp.*, Civil Action No. 80–2081, Bench Op. (D.N.J. Nov. 8, 1984), Judge Barry reached a different conclusion. Judge Barry found, based on four of the eight items which

---

4. Defendant has submitted a number of other recent decisions—all unpublished—in which courts granted motions similar to the one now before me but which, for various reasons, I find unhelpful. In *Jarusewicz v. Johns-Manville Products Corp.*, No. L–3220–80 (N.J.Super.Ct. Law Div., Middlesex County Jan. 5, 1983), the court issued an Order unaccompanied by an opinion. Eagle-Picher has attached its own brief and letter memorandum in *Jarusewicz* to the court's order; however, none of the opposing submissions in that case is attached. It is therefore impossible to tell what the court in *Jarusewicz* considered in making its ruling.

Similarly, in *Thomas v. Johns-Manville Sales Corp.*, No. 82–0793 (D.D.C. Oct. 21, 1983), the court adopted the report of the federal magistrate on the punitive damages issue, in which the magistrate stated that the *Thomas* plaintiffs failed to offer a single piece of evidence to support their punitive damages claim. Plaintiffs in this case have introduced a number of items to support their claim. *See infra* at 11–12.

There was some significant discussion of the punitive damages issue in *Moore v. Johns-Manville Corp.*, No. 942 (Pa.Ct. Common Pleas, Philadelphia County June 4, 1981), in which Judge Takiff, ruling from the bench, granted Eagle-Picher's motion to dismiss the punitive damages claims against it. Plaintiff's argument in *Moore*, however, rested primarily on Eagle-Picher's ignorance of the medical literature on asbestosis. Plaintiffs in this case rely not on Eagle-Picher's ignorance but on its knowledge.

Finally, in *Oliver v. Johns-Manville*, Nos. L–32410–80, L–013445–83 (N.J.Super.Ct. Law Div., Middlesex County Nov. 30, 1984), Judge Keefe expressly relied on his earlier decision in *Konrad v. H.W. Porter*, which I discuss in the text. Tr. at 35–36. There is no discussion in *Oliver* of any of the exhibits before me on Eagle-Picher's motion.

5. Judge Keefe also considered portions of the Huelster deposition which are not before me in this case.

plaintiffs have submitted in this case,[6] that a jury could determine that the *Berg-Fischer* requirements for punitive awards were met. Bench op. at 7–9.

The *Konrad* and *Herber* decisions are not necessarily in conflict. Judge Barry considered a number of items not mentioned in *Konrad*; one might reasonably infer that the cumulative effect of this additional evidence tipped the scales in plaintiff's favor in *Herber*. Because my own evaluation of the evidence differs somewhat from Judge Barry's, however, I proceed to consider the record before me afresh.

Plaintiffs' evidence can conveniently be broken down chronologically. Three items—the Aber memorandum, the Harrington memorandum, and the medical publications found in Eagle-Picher's research library—bear on what defendant knew about asbestos-related health risks prior to 1964, the year in which defendant began using warnings on its asbestos products.[7] The rest of plaintiffs' submissions concern defendant's knowledge after 1964.

■ The chronological divide is an important one for purposes of assessing the viability of plaintiffs' punitive damages claim. Defendant is liable for punitive damages based on its pre-1964 conduct if, given its knowledge of the relevant health risks, its *silence* as to those risks constituted reckless indifference to the possible ill effects of its products on Mr. Goncalves and others like him. Once defendant began using warnings, the inquiry changes substantially: the question becomes whether the *warnings* were so inadequate as to constitute reckless indifference given defendant's knowledge. As a practical matter, it is easier to satisfy *Berg's* reckless indifference prong by defendant's silence than by the use of an insufficient warning. Because of this difficulty, evidence of defendant's knowledge after warnings are used

ordinarily goes to the adequacy of the warnings and not to punitive damages. *Gill v. Pacor, Inc.*, 24 Pa. D. & C.3d 659, 679 (Pa.Ct. Common Pleas, Phila. County 1982) (Takiff, J.) (applying Pennsylvania law). With this common-sense distinction in mind, I turn to the evidence of Eagle-Picher's pre-1964 knowledge of the risk of asbestos-related disease.

Neither the Aber memorandum nor the Harrington memorandum suffices to create a fact issue regarding defendant's knowledge. The Aber memorandum does not itself convey any information about asbestos, and there is no evidence that anyone besides Aber read the article to which he refers. Moreover, that article, as *Konrad* suggests, is at most a heavily qualified statement of the risks of asbestos. Defendant may well have been negligent to overlook such data, but no reasonable jury could find that it was recklessly indifferent within the meaning of *Berg* and *Fischer*. The Harrington memorandum is even less helpful to plaintiffs. That document, written in 1962, reviews the incidence of asbestos-related workers' compensation claims. Harrington states that eighteen such claims have been filed nationwide, and calls this frequency a "fad." None of the claims to which Harrington refers were filed against Eagle-Picher. The memorandum suggests not knowledge, but ignorance: Harrington concludes by noting that a producer association "is now compiling information on this problem," and calls for the development of more data on the subject. In short, the Harrington memorandum may be evidence of Eagle-Picher's negligence; it does not create a fact issue with regard to the company's knowledge.

The other item of pre-1964 evidence is more substantial. Plaintiffs have introduced portions of three medical publications found in Eagle-Picher's Research Library. Each of the publications was

---

**6.** Items four, six, seven, and eight in the list, *supra* at 11–12, do not appear in the list of items Judge Barry considered in making her decision. *Herber, supra,* Bench op. at 8–9.

**7.** Plaintiffs deny that defendant used warnings on its packages after 1964, but offer no evidence to support their contention. The Bockstahler affidavit is therefore uncontradicted on this issue.

stamped received by the research library; the dates ranged from 1930 to 1953. The one-page excerpt of "The Chemistry of Industrial Toxicology" states, *inter alia*, that "[a]sbestos ... causes a fibrotic lung condition known as asbestosis, which resembles silicosis in many respects and can be almost as serious." The excerpted portions of "Industrial Dust" discuss the pathology of asbestosis; there is no discussion of causes or acceptable and unacceptable exposure levels. The third publication, entitled "Occupational Medicine and Industrial Hygiene," is excerpted at greater length, and contains some discussion of exposure levels. The important passage for our purposes reads:

> One point of practical significance may be indicated by these observations; namely, that very finely ground asbestos is not dangerous. This conclusion has support in clinical observation, for it has long been known that at the Thetford Mills there was no clinical asbestosis even though in former years the atmosphere was very dusty and the dust was extremely fine. The fact that fabrication of fibres of the same mineral in American plants could produce disease was one of the puzzling features of this disease. But those experiments offer a plausible explanation. The fine dust in the mills is composed of serpentine and extremely short chrysotile fibres; that in the spinning and weaving mills contains many more long fibres.

R. Johnstone, *Occupational Medicine and Industrial Hygiene* 369, 372 (1948) (excerpted in Exhibit C to Plaintiffs' Supplemental Brief in Opposition to Motion for Partial Summary Judgment).

The quoted passage, together with the rest of the excerpted materials, suggests (1) that exposure to certain types of asbestos fibers is dangerous, and (2) that exposure to "very finely ground asbestos" is not. Unfortunately, there is nothing in the record before me concerning the nature of Anthony Goncalves' exposure to asbestos. Given the posture in which I consider the issue—a motion for partial summary judgment by the defendant—I must assume that Mr. Goncalves' exposure was of the sort which the Johnstone book defines as dangerous.

The record is incomplete in another critical respect. There is nothing before me concerning the role defendant's research library played in its operations, or the manner in which information such as this flowed from the library to the concerned divisions of the company. Accordingly, I must assume, for purposes of deciding the instant motion, that the information contained in the articles is fully chargeable to responsible Eagle-Picher officials.

■ Given my assumptions concerning the nature of plaintiff's exposure and the scope of defendant's knowledge of materials in its research library, I must conclude that there is an issue of material fact with regard to defendant's knowledge of asbestos-related risks prior to 1964. Taking the most favorable view (for plaintiff) of the evidence before me, a jury could conclude that defendant had knowledge of the relevant risks. And if such knowledge were found, a jury could also reasonably find that the failure to warn users such as Mr. Goncalves exhibited reckless indifference to the potential consequences of their exposure to asbestos.

For these reasons, defendants' motion for partial summary judgment will be denied insofar as it seeks dismissal of plaintiffs' punitive damages claim. I need not consider the effect of the evidence regarding post-1964 knowledge.