217 N.J. Super. 448 (1987)
526 A.2d 242
CAROLYN EDWARDS, AS PARENT AND NATURAL GUARDIAN OF EUGENE EDWARDS, INFANT PLAINTIFF AND CAROLYN EDWARDS, IN HER OWN RIGHT, PLAINTIFFS-APPELLANTS, CROSS-RESPONDENTS,
v.
OUR LADY OF LOURDES HOSPITAL AND RESPIRATORY THERAPY DEPARTMENT, DEFENDANTS-RESPONDENTS, CROSS-APPELLANTS, AND DR. Y.J. LEE, DR. TIMOTHY RYAN, JANE SANTO, R.N., TANYA LINCOLN, R.N., SISTER CORRY, GLORIA KORTH, R.N., DR. ARNOLD SOLOF, DR. WILLIAM YANG, AND DORIS FARLOW, R.N., DEFENDANTS-RESPONDENTS, AND DR. ROBERT BOOVA, DR. CYNTHIA VILLASIS, DR. ALEX MAKRAS, DR. FRANCIS BARSE, DR. STUART KRAVITZ AND DR. DAVID SCHULTZMAN, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 26, 1987.
Decided May 7, 1987.
*450 Before Judges MORTON I. GREENBERG, J.H. COLEMAN and R.S. COHEN.
Roseann Sellani Oliver argued the cause for appellants, cross-respondents (Ballen, Keiser & Gertel, attorneys; Roseann Sellani Oliver on the brief).
John J. McLoughlin, Jr., argued the cause for respondent Doris Farlow, R.N. (Richard A. Amdur, attorney; Edward M. Henfey on the brief).
Richard H. Grossman argued the cause for the respondents, cross-appellants, and the other defendants-respondents (Grossman & Kruttschnitt, attorneys; Steven F. Nemeth on the brief).
The opinion of the court was delivered by J.H. COLEMAN, J.A.D.
In this medical malpractice case, the infant plaintiff is severely retarded and his right leg has been amputated at the hip level, including one-half of his hip. Plaintiffs contended that defendants negligently deprived Eugene of oxygen which caused brain damage and mental retardation, and that surgery and care negligently performed or provided necessitated the amputation. A jury found that defendants Dr. Robert Boova, the Respiratory Therapy Department and Nurse Doris Farlow were negligent. It assessed the negligence at 90.2%, 5.1% and 4.7% respectively. Drs. Boova and Villasis settled prior to the verdict. The jury awarded compensatory damages of $1,267,530 to Eugene and his mother and punitive damages of $225,000 to the infant against the hospital. Plaintiffs have appealed *451 the denial of a motion for a new trial under A-5792-84T1 as to the following defendants, who were found not to be negligent: Drs. Y.J. Lee, Timothy Ryan, William Yang and Arnold J. Solof; Jane Santo, R.N., Tanya Lincoln, R.N., Gloria Korth, Director of Nursing and Sister Corry, Hospital Administrator. Under the same docket number, the Respiratory Therapy Department and Our Lady of Lourdes Hospital have cross-appealed the entry of judgment for the punitive damages.
Plaintiffs have also filed another appeal under A-3254-85T8 in which they challenge the constitutionality of N.J.S.A. 2A:53A-8. We hereby consolidate these appeals. We now affirm the order denying the motion for a new trial; we reverse that part of the judgment awarding punitive damages and we do not declare N.J.S.A. 2A:53A-8 to be unconstitutional.
Based on the evidence presented during the six week trial, the jury could have believed that the following occurred. On October 31, 1979, at about 7:00 p.m., Carolyn Edwards gave birth to Eugene Edwards at defendant hospital. Eugene was born prematurely at 27 weeks of gestation weighing 1130 grams, which is about two and one-half pounds. About 90% of babies born after 27 weeks of gestation have head sizes larger than Eugene's at the time of birth. Eugene may have been microcephalic. Dr. Arnold J. Solof, a pediatrician, was the night physician on duty for the Neonatal Intensive Care Unit (NICU) at the time of delivery. He was summoned to the delivery room because it was expected that the delivery would be extremely premature.
Eugene was delivered by an obstetrician who is not implicated in this appeal. No fetal heart rate was detected for 17 to 22 minutes before delivery. At the time of delivery, Eugene had no detectable heart beat and was not breathing. He was in shock from blood loss, much of which preceded his mother's appearance at defendant hospital. The initial examination of the mother at the hospital revealed placenta abruption, which interrupted the baby's supply of nutritive materials and oxygen. *452 By the mother's history, this occurred several hours before hospitalization. One minute after birth, the Apgar score reflected zero respiration and heart beat. Eugene was born with a defective heart and a condition of the lungs called hylaine membrane disease. Both of the conditions were caused by premature birth and they had the potential to impede the circulation of blood and oxygen.
Eugene had to be resuscitated in the delivery room. To accomplish this, Dr. Solof inserted an endotracheal tube into the baby's trachea through his mouth and gave him oxygen from a portable tank. The Apgar scores were three at one minute and seven at five minutes after birth. The Apgar scores reflect a pediatrician's evaluation of the baby's activity and appearance. Ten is a perfect score. Both of the Apgar scores reflected that Eugene was suffering from blood loss and asphyxia. A transfusion of albumin was administered to help relieve the shock caused by the loss of blood. Within a few hours of birth, up to one-half of Eugene's blood was replaced through transfusions.
Within about five minutes after birth, Eugene was transferred from the delivery room to the NICU after some stabilization had been achieved. He was still receiving oxygen from a portable tank through the use of a laerdal bag which was connected to the endotracheal tube. The laerdal bag was used for artificial respiration. Upon arrival in the NICU, an oxygen hood was set up for Eugene and he was given 100% oxygen. A cardio-pulmonary monitor was used to check his heart beat and respiration. After he was under the oxygen hood for a short time, Eugene became cyanotic, meaning a lack of oxygen in his blood.
When Eugene became cyanotic, Dr. Solof, or a respiratory therapist, placed the baby on a respirator, which is a mechanical breathing machine. The respirator was connected to the endotracheal tube and to an oxygen supply system accessed through a wall outlet. It is unclear whether a flow meter was required to get oxygen from the wall outlet to the respirator. A flow *453 meter is used to control the flow of oxygen by an observable gauge. Two oxygen outlets were located at each station where a baby might have been located in the NICU, including Eugene's. The Respiratory Therapy Department, a named defendant, was responsible for setting up and maintaining the oxygen and all of the respiratory equipment. After the respirator had been connected to the oxygen wall outlet, Dr. Solof did not notice whether the flow meter necessary to connect the laerdal bag to the second wall outlet, which served as a backup, had been disconnected.
Dr. Solof left the NICU between 8:15 and 8:30 p.m. on October 31, 1979. At about 9:30 p.m. he was informed that Eugene's heart rate had dropped and that his skin color had changed. The respirator had malfunctioned, apparently, and there was no backup source of oxygen in the NICU. Dr. Solof responded to the NICU within a few seconds and found Eugene's heart beat had dropped to 80 beats a minute, down from about 140 per minute. A nurse informed him that she tried to use the laerdal bag but it had been disconnected from the oxygen wall outlet. It was then discovered that the flow meter from the second wall outlet at Eugene's station was missing. It was believed to have been removed by an employee from the Respiratory Therapy Department. This caused a delay in resuscitating Eugene.
Dr. Solof disconnected the respirator after he increased the percentage of oxygen and noticed no improvement in Eugene's condition. He then used the laerdal bag to pump normal room air containing 21% oxygen into Eugene's lungs. Shortly thereafter, one of the NICU nurses retrieved from the delivery room a portable supply of oxygen which was connected to the laerdal bag. Having at that point been without 100% oxygen for a period of five to seven minutes, Eugene was given oxygen. Someone from the Respiratory Therapy Department corrected the problem with the wall outlets and the supply of oxygen. Eugene was reconnected to the respirator which was again *454 attached to the endotracheal tube. We are unable to determine from the record what caused the respirator to malfunction.
Plaintiffs' expert Dr. Robert G. Kettrick testified that the conduct of Dr. Solof "clearly and unequivocally" fell below the proper standard of care, and that Dr. Solof was directly responsible for the mental retardation. He also indicated that when the resuscitation did not immediately bring Eugene's heart rate up to the normal range, Dr. Solof should have performed open heart massage to push blood to the baby's brain. He further testified that the prolonged use of an umbilical-arterial catheter, through which caustic, irritating, sclarosing drugs passed, harmed Eugene and deviated from the minimum standard of care which Dr. Solof should have followed. Dr. Solof testified that it was not his job to make sure that a flow meter was attached to the second wall outlet for emergency use of the laerdal bag. The deposition testimony of Nicholas Matluck, the hospital's director of the Respiratory Therapy Department, stated essentially the same thing. Matluck also stated that routine inspections were made of the respiratory equipment and no defects were disclosed.
After Eugene was reconnected to the respirator, he may not have been placed in proper restraints. This allowed him to dislodge the endotracheal tube on at least six occasions. When the tube was dislodged or extubated, that interrupted the supply of oxygen throughout Eugene's body, including his brain. Dr. Yang repositioned the tube initially. Thereafter, he elected to extubate and reintubate Eugene with a larger endotracheal tube. Dr. Yang testified he did not call an anesthesiologist or Dr. Lee to do this because this was "routine pediatric neonatology procedure." Eugene's blood pressure dropped after this procedure for two to three minutes, during which time a nurse performed closed heart message. Multiple attempts to reintubate were finally successful. Dr. Kettrick testified that Dr. Yang's failure to request an anesthesiologist's assistance from the onset constituted a deviation from the proper standard *455 of care. He finally agreed, however, that a pediatrician could have more experience in this regard than an anesthesiologist.
The notes of various doctors in the hospital records from November 2, 1979 to November 14, 1979 revealed that there were problems with the circulation in Eugene's lower extremities. To improve his circulation, an intravenous line or tube had to be inserted. Eugene, however, had problems maintaining the line. On November 19, 1979 Dr. Lee, the Director of the NICU, authorized Dr. Villasis, a neonatal fellow on duty, to write an order for a cut-down consultation. A cut-down is a surgical procedure whereby a scalpel is used to make an incision to open the skin and a small catheter is inserted into a vein to provide fluids.
Defendant Dr. Timothy Ryan was in charge of the NICU on the evening of November 19, 1979. At approximately 12:15 a.m. that night Dr. Ryan entered the NICU where defendant Dr. Boova, a surgical resident from Jefferson Medical Hospital College on a three month rotation in defendant hospital, had begun the cut-down in the right groin area. Dr. Ryan did not participate in the cut-down procedure. Dr. Boova's negligence in inserting the catheter into an artery rather than a vein is not contested in this appeal. One-half hour after the cut-down, Dr. Ryan observed that Eugene's right leg was blanched. He informed Dr. Villesis. Dr. Ryan then contacted Dr. Boova who ordered the intravenous solution to be stopped. Plaintiffs' experts testified that the proper standard of care would have been for Dr. Ryan to have reinformed Dr. Villesis after the lack of improvement, and if he did not get an adequate response, he should have gone over Dr. Villesis' head to Dr. Lee. Plaintiffs' expert concluded that his failure to do so proximately contributed to the amputation.
Dr. Lee was the attending neonatologist and director of the NICU at the time of Eugene's birth, and was directly responsible for its maintenance. On November 19, 1979 he was Eugene's attending physician and knew of his circulatory access *456 problems throughout the day. He ordered Dr. Villesis to write an order for a cut-down consult to be performed by Dr. Boova. Dr. Kettrick testified that this was a "casual and cavalier" approach to a cut-down in such a small child which contributed to the need for the amputation. He also testified that in addition to Dr. Solof, Dr. Lee shared responsibility for insuring that backup oxygen was available in the NICU, and his failure to do so deviated from the proper standard of care.
Present at the beginning of the cut-down was defendant Nurse Santo, a new graduate nurse who had just started working in the NICU. She was Eugene's attending nurse on the 3-11 shift that evening. She had never seen a cut-down in the femoral area before. She was present when Dr. Villesis wrote the order for the cut-down and when Dr. Boova started it. Plaintiffs contend that Nurse Santo did not question the choice of location for the cut-down, although she reasonably could have been expected to know that the femoral area was an improper site for a premature baby, nor did she question Dr. Boova despite the medical records having indicated that pulses to the right leg were diminished. Plaintiffs' experts testified that Nurse Santo should have questioned the doctor as to the choice of location for the cut-down because she was "in the best position to know about the baby," and had a duty to report to her supervisor that a surgical student was going to operate on the prematurely born baby.
At about 11:00 p.m. Nurse Santo went off duty and defendant Nurse Lincoln came on duty for the 11-7 shift. Nurse Lincoln thought that Dr. Boova had placed the cut-down in an artery, not a vein, but when she brought this to Dr. Boova's attention he told her he knew where the cut-down was. Throughout the night, however, the baby's condition got worse. She noticed that Eugene's foot was blanched. Nurse Lincoln told Dr. Boova that there were problems with the artery. He responded that she did not know what she was talking about. He told her to hook up the intravenous line. When she did so, *457 however, blood came pulsing back. She informed him of this, but Dr. Boova took no action, and left the NICU.
Before Dr. Boova left the floor on which the NICU was located, Nurse Lincoln asked him "to please come back and look at it." Dr. Boova replied that there was no need to do so and instructed her to hook up the intravenous fluids to the catheter. She made several attempts to contact Nurse Farlow, her nursing supervisor. Nurse Farlow told her to call Dr. Boova, not Dr. Lee. She did not contact Dr. Lee. Plaintiffs' experts testified that Nurse Lincoln should have called Dr. Lee, and that she should have refused to allow hyperalimentation fluids, a solution which is caustic to arteries, to be infused through the catheter after she had documented her concern over the low blood flow to the leg.
At 5:00 a.m. Dr. Boova ordered the hyperalimentation stopped. The catheter, however, was not removed, and a neutral fluid was allowed to continue infusing through the artery. At 7:30 a.m. the nurses for the day shift came on duty and one of them immediately called Dr. Lee and Dr. Spyrou, a vascular surgeon. Eugene was taken to the operating room. The preoperative diagnosis was gangrene of the right leg. Dr. Spyrou's operative attempts to re-establish the blood flow in the gangrenous extremity were unsuccessful. Eugene was later transferred to Children's Hospital in Philadelphia. By that time the gangrene had already spread to the abdominal wall; it was too late to save the leg. Eugene's right leg was amputated at the hip level including one-half of the buttocks. Eugene was discharged from Children's Hospital at the age of one and one-half years. He has been diagnosed as severely mentally retarded and orthopedically handicapped.

NEW TRIAL MOTION
Plaintiffs contended below and again on this appeal that the jury's verdict exonerating the previously named defendants was against the weight of the evidence. R. 2:10-1, which *458 governs the motion, provides "[t]he trial court's ruling on such a motion shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law." This was a lengthy and complicated case in which the jury heard many witnesses, most of whom were doctors and nurses. Each theory of liability advanced by plaintiffs against each defendant involved in the motion for a new trial was countered by the presentation of opposing evidence. The believability of plaintiffs' contentions was for the jury's exclusive determination. Despite the compelling evidence that substantial brain damage may have occurred independent of any alleged negligence on the part of any of the defendants, plaintiffs tried the case on the theory that the brain damage was caused solely by the negligence of the defendants. The trial judge nonetheless properly instructed the jury on apportionment of damages pursuant to Fosgate v. Corona, 66 N.J. 268, 272-274 (1974). The jury was therefore required to decide whether brain damage preexisted the delivery, and if so whether it was aggravated by any post-delivery negligence of any defendant which proximately contributed to the severe mental retardation.
Based on our careful study of the record, we agree with the trial judge who had a feel for the case that there was no miscarriage of justice under the law. Carrino v. Novotny, 78 N.J. 355, 360-361 (1979); Dolson v. Anastasia, 55 N.J. 2, 6-8 (1969). It is clear that the jury rejected many of plaintiffs' factual assertions and much of plaintiffs' experts' testimony regarding the standard of care and deviation therefrom. Indeed, it had every right to do so. Amaru v. Stratton, 209 N.J. Super. 1, 20 (App.Div. 1985). The jury most likely concluded, as it had the right, that all of Eugene's brain damage was caused by the prenatal bleeding and his premature birth. Such a conclusion would be supported by substantial evidence in the record. Similarly, the jury was free to conclude that none of the defendants involved in the motion for a new trial was negligent. Consequently, we affirm the order denying the motion for a new trial.

*459 PUNITIVE DAMAGES
In the cross-appeal, the hospital and the Respiratory Therapy Department contend that their motion made pursuant to R. 4:37-2(b) to dismiss the punitive damage claim should have been granted. These defendants did not file a motion for a new trial based on the contention that the punitive damages were not supported by sufficient credible evidence. R. 4:49-1(a). Plaintiffs have urged that they were entitled to punitive damages and the failure to file a motion under R. 4:49-1(a) precludes defendants from advancing this issue on appeal. See R. 2:10-1.
We reject plaintiffs' contention. The hospital's motion before the trial court was based on a claim that plaintiffs failed to present any proofs entitling them to punitive damages. The standard for determining a motion for involuntary dismissal at the completion of plaintiffs' case under R. 4:37-2(b) is that the court must accept as true all the evidence which supports the position of the party defending against the motion and must accord that party the benefit of all inferences which can reasonably and legitimately be deduced therefrom, and if reasonable minds could differ, the motion must be denied. Dolson v. Anastasia, 55 N.J. 2, 5 (1969). The judicial function is quite a mechanical one. "The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Id. at 5-6. Contrary to plaintiffs' assertion, the hospital's motion was directed to the absence of proofs rather than the weight of the evidence. Hence, R. 2:10-1 is inapplicable.
The punitive damage claim came into the case when leave of court was granted plaintiffs to file a Fourth Amended Complaint to allege punitive damages against the hospital and Dr. Boova. In Counts Fifteen and Sixteen of the Fourth Amended Complaint plaintiffs sought punitive damages from the hospital and Dr. Boova respectively. Plaintiffs alleged that the hospital *460 failed to supply adequate staffing for clinical supervision of the 11-7 nursing shift, that the hospital had knowledge that the staffing was inadequate and not qualified, and that the hospital therefore engaged in wanton misconduct in reckless disregard of Eugene's rights.
At the end of plaintiff's case counsel for the hospital made a motion to dismiss plaintiffs' claims for punitive damages, contending that plaintiffs had failed to introduce evidence to establish the required willful or wanton misconduct. In response, counsel for plaintiffs stated that punitive damages were sought only from the hospital as a named defendant. She stated that the theory for punitive damages was that if the jury believed that defendant hospital held itself out as a specialized hospital "and then failed to provide sufficient oxygen on a 24 hour basis after they specifically guaranteed to the State that they would do that, ... then they could find that the hospital itself was guilty of punitive conduct." Plaintiffs have not argued in their briefs that Dr. Boova's conduct should be considered.
The Twelfth Count of the complaint alleged as ordinary negligence, essentially the same conduct plaintiffs relied on to establish gross misconduct against the hospital alleged in the Fifteenth Count. Plaintiffs may not recover punitive damages by "recasting merely negligent conduct as `willful and wanton.'" Entwistle v. Draves, 102 N.J. 559, 562 (1986). To warrant punitive damages, the hospital's conduct must consist of "an intentional wrongdoing in the sense of an `evil-minded act' or an act accompanied by a wanton and wilful disregard of the rights of another." Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49 (1984). There must have been a "positive element of conscious wrongdoing." Berg v. Reaction Motors Div., 37 N.J. 396, 414 (1962). Neither mere negligence nor gross negligence can support an award of punitive damages. LoRocco v. N.J. Mfrs. Ind. Co., 82 N.J. Super. 323, 327 (App.Div. 1964), certif. den., 42 N.J. 144 (1964). Punitive damages are assessed when a wrongdoer's conduct is especially *461 egregious. Leimgruber v. Claridge Associates, Ltd., 73 N.J. 450, 454 (1977); Berg, supra, 37 N.J. at 413. The underlying theory is to punish the offender for aggravated misconduct so as to deter such conduct in the future. Fischer v. Johns-Manville Corp., 103 N.J. 643, 662 (1986); Leimgruber, supra, 73 N.J. at 454.
Contrary to the position plaintiffs took in opposition to the motion to dismiss the punitive damages claim at the end of plaintiffs' case, they contend in this appeal that they were entitled to punitive damages because
(1) the hospital and its agents failed to provide emergency oxygen to the infant plaintiff in the Neonatal Intensive Care Unit two hours after his birth ..., (2) the hospital and its agents failed to properly monitor the endotracheal tube ... thereby permitting the infant to remove the tube . .. not once but several times ..., (3) the hospital and its agents failed to monitor the blood levels of the infant plaintiff when he was receiving a potent drug (Digoxin), a drug that regulates the beat of the heart ..., and (4) the hospital and its agents failed to provide a skilled staff to perform a cut-down causing the infant to sustain an arterial obstruction to a major artery in the groin and once having this serious problem, the hospital failed to provide a staff skilled enough to recognize the urgency of the problem causing the infant to develop a gangrenous limb over a seven hour period.
This is a substantial change of position by plaintiffs. At the time of trial, plaintiffs contended it was the lack of a backup supply of oxygen in the NICU and a spare flow meter within the first few hours following Eugene's birth that entitled him to punitive damages. Now they contend that it was the acts and omissions of everybody associated with the hospital between October 31, 1979 when Eugene was born until November 19, 1979 when he developed gangrene of his right leg which required amputation that entitled Eugene to punitive damages. Notwithstanding this substantial change of position, it is the total failure of the proofs to establish the required elements which compels us to reverse the punitive damages award.
Based on our careful study of the record, we are convinced that plaintiffs are relying on the same evidence to establish negligence and the elements for punitive damages. Conduct decidedly more culpable than ordinary negligence was *462 required. We have set forth with some detail the evidence presented to the jury. Plaintiffs did not prove that the hospital through its Respiratory Therapy Department, or Nurse Farlow for that matter, committed "a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." Berg, supra, 37 N.J. at 414 (emphasis added).
Plaintiffs are simply trying to recast negligent conduct as willful and wanton misconduct. That is not permitted. Even though the laerdal bag was disconnected from the second wall outlet while Eugene's respirator was connected to the other wall outlet for oxygen, the laerdal bag at the time was to have been used for a backup ventilatory procedure should the respirator have malfunctioned. There was no evidence that Eugene was connected to a respirator with a history of malfunctioning or that someone deliberately tampered with his respirator. The flow meter removed from Eugene's area was not in actual use at the time. Similarly, there was no evidence that the hospital was aware that no portable supply of oxygen was in the NICU or that a backup flow meter was not readily available for Eugene. The fact that the hospital was certified as a specialized hospital does not alter the standard for imposing punitive damages.
In these circumstances, we conclude that disconnecting the laerdal bag or removing the flow meter and failing to have a portable supply of oxygen in the NICU merely established negligence, or perhaps gross negligence at best, but not the aggravated and egregious conduct essential to a successful claim for punitive damages. There was no evidence tending to establish any intentional wrongdoing or evil mindedness or "positive element of conscious wrongdoing" on the part of the hospital. While the differences in gravity of fault cannot always be stated with mathematical precision, our careful study of the full record convinces us that the proofs when considered as a whole, were insufficient to warrant submitting the issue of punitive damages to the jury. See Gautam v. De Luca, 215 *463 N.J. Super. 388 (App.Div. 1987). Consequently, we are satisfied that the hospital's motion to strike the claim for punitive damages should have been granted.
We also agree with the hospital that the issue of punitive damages was improperly stated in the special interrogatory submitted to the jury. Since the hospital did not object below, plain error rule is invoked. R. 2:10-2.
Even though the hospital did not object to the single question submitted to the jury on punitive damages, it now contends that the jury was essentially directed to return a verdict for punitive damages against the hospital. By way of background, we note that the jury received very little guidance on the issue of punitive damages. Counsel for plaintiffs made no argument in his summation for punitive damages. In special interrogatories submitted to the jury regarding the negligence of the various defendants, it was not asked to decide whether the hospital was negligent. Only a single question was presented to the jury concerning punitive damages: "What amount of punitive damages is to be awarded in favor of plaintiff, Eugene, and against Our Lady of Lourdes Hospital?" Unlike the two-part questions submitted on the negligence and proximate cause of the other defendants, the jury was not asked to first decide whether the hospital's misconduct or omissions were egregious enough to require it to pay punitive damages. As to the law, the jury was instructed that:
YOU MAY AWARD SUCH DAMAGES IF YOU DETERMINE THAT THE DEFENDANTS' ACTS WERE ACTUATED BY ACTUAL MALICE, WHICH IS NOTHING MORE OR LESS THAN INTENTIONAL WRONGDOING, OR AN ACT ACCOMPANIED BY A WANTON AND WILFUL DISREGARD OF THE RIGHTS OF ANOTHER; IN OTHER WORDS, A DELIBERATE ACT OR A DELIBERATE OMISSION TO ACT WITH KNOWLEDGE OF A HIGH DEGREE OF PROBABILITY OF HARM TO ANOTHER AND RECKLESS INDIFFERENCE TO THE CONSEQUENCES OF HIS ACT OR THEIR ACTS.
The court made no reference to the evidence in its punitive damage charge. Then the court concluded this part of its charge with the following:

*464 BASICALLY WHAT THE PLAINTIFF IS ASKING YOU TO DO IS TO CANVAS THE RECORD TO SEE IF YOU CAN CONCLUDE THAT THE ACTS OF THE VARIOUS DEFENDANTS IN THIS CASE ROSE TO THE LEVEL OF A RECKLESS DISREGARD FOR THE LIFE AND HEALTH OF ANOTHER. [Emphasis supplied]
Although the jury charge was legally correct, it was inadequate in this case. Neither the summation nor the charge informed the jury what the punitive damage claim was. Also the charge and the special interrogatory left the jury free to return punitive damages against the hospital based on the conduct of Dr. Boova which was not sought. However, a new trial is not required by the plain error rule because we have concluded that the punitive damage claim against the hospital should have been dismissed.
We question, without deciding, whether punitive damages may be recoverable from a defendant in the circumstances of this case whose negligent conduct is so disproportionately small in relation to the overall negligence in the case. We agree with the trial judge that the Respiratory Therapy Department is simply a unit of the defendant hospital, and not independent of the hospital, despite plaintiffs' oblique contention to the contrary. The jury found it was only 5.1% negligent. In this case which involves substantial compensatory damages, a finding of 5.1% negligence tends to contradict the award of punitive damages against the hospital. See Nappe, supra, 97 N.J. at 50-51. The hospital's conduct was not considered by the jury to be egregious.
Having found that the punitive damage claim against the hospital should have been dismissed, we decline to address plaintiffs' contention that the hospital can be compelled to pay punitive damages notwithstanding the $10,000 limitation on liability pursuant to N.J.S.A. 2A:53A-8. In any event, for commentary relevant to this issue, see the discussions in Schultz v. Roman Catholic Archdiocese of Newark, 95 N.J. 530, 535-539 (1984); Foldi v. Jeffries, 93 N.J. 533 (1983); Katz v. Rahway Hosp., 214 N.J. Super. 379, 382-385 (App.Div. 1986); Brown v. Anderson County Hospital Ass'n, 268 S.C. 479, 234 *465 S.E.2d 873, 876-877 (1977) (no charitable immunity for hospital's "heedlessness and reckless disregard of the plaintiff's rights"); Bottari, The Charitable Immunity Act, 5 Seton Hall Legis. J. 61 (1980); Tort Immunity of Nongovernmental Charities  Modern Status, 25 A.L.R.4th 517 (1983).

THE CONSTITUTIONAL ATTACK ON N.J.S.A. 2A:53A-8
Under the first three point headings of plaintiffs' brief filed in A-3254-85T8, they contend that N.J.S.A. 2A:53A-8 is unconstitutional for various reasons. N.J.S.A. 2A:53A-8 was part of the Legislature's response to Collopy v. Newark Eye and Ear Infirmary, 27 N.J. 29 (1958), Benton v. Y.M.C.A., 27 N.J. 67 (1958) and Dalton v. St. Luke's Catholic Church, 27 N.J. 22 (1958), which overruled judicially declared immunity for certain charitable organizations. Subsequent to the decisions in the Collopy trilogy of cases, the Legislature passed N.J.S.A. 2A:53A-7 and 2A:53A-8 providing limited charitable immunity for nonprofit hospitals for negligence liability over $10,000. N.J.S.A. 2A:53A-7 provides:
No nonprofit corporation ... organized exclusively for ... hospital purposes shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation ... where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation....
N.J.S.A. 2A:53A-8 provides:
Notwithstanding the provisions of the foregoing paragraph, ... any nonprofit corporation ... organized exclusively for hospital purposes shall be liable to respond in damages to such beneficiary who shall suffer damage from the negligence of such corporation ... or of its agents or servants to an amount not exceeding $10,000.00, together with interest and costs of suit, as the result of any 1 accident and to the extent to which such damage, together with interest and costs of suit, shall exceed the sum of $10,000.00 such nonprofit corporation ... organized exclusively for hospital purposes shall not be liable therefor.
Here, the jury awarded plaintiffs $64,644.03 in compensatory damages against the Respiratory Therapy Department, which was a unit of defendant hospital. That verdict was molded to *466 $10,000 pursuant to N.J.S.A. 2A:53A-8. At oral argument we pointed out that subsection 8 gave back to plaintiffs $10,000 which subsection 7 had taken away and that because they had not attacked subsection 7 in this appeal, a finding that subsection 8 is unconstitutional would mean returning the $10,000. Obviously, that would make no sense.
Despite the temptation, we decline to address whether subsection 7 is unconstitutional because that issue has not been raised before us in this appeal. See Whitfield v. Blackwood, 101 N.J. 500, 504-505 (1986). In addition, we fail to perceive any basis for concluding that subsection 8, when considered alone, is unconstitutional since it gives money to a plaintiff that subsection 7 would otherwise preclude. We will not construe subsection 8 to reach an unreasonable or absurd result. State v. Gill, 47 N.J. 441, 444 (1966); Galanter v. Planning Bd. of Tp. of Howell, 211 N.J. Super. 218, 221 (App.Div. 1986). Hence, we find no sound reason to reach the constitutional issues, some of which were discussed in Makar v. St. Nicholas, etc. Church, 78 N.J. Super. 1 (App.Div. 1963) and Vitolo v. St. Peter's Church, 118 N.J. Super. 35 (App.Div. 1972). However, given the new corporate structure many hospitals are now formulating, some of which are designed to make profits, the Legislature should reconsider the present hospital immunity law, N.J.S.A. 2A:53A-7 et seq.
We have carefully considered the remaining issues raised in the appeals and the cross-appeal and find each is clearly without merit. R. 2:11-3(e)(1)(E). The order denying plaintiffs' motion for a new trial is affirmed. The award of punitive damages is vacated. We do not declare N.J.S.A. 2A:53A-8 to be unconstitutional. We remand the matter to the Law Division for the entry of an amended judgment vacating the punitive damages.
Modified and affirmed.